UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TERRELL ZEIGLER,

                              Plaintiff,

        v.

ACTING COMMISSIONER ANTHONY J.
ANNUCCI, LEROY FIELDS, STEPHEN
URBANKSI, *and* AKINOLA
AKINYOMBO,

                              Defendants.

---

No. 23-CV-707 (KMK)

OPINION & ORDER

<u>Appearances</u>:

Terrell Zeigler
Cheektowaga, NY
*Pro se Plaintiff*

Gee Won Cha
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Terrell Ziegler, proceeding pro se, brings this Action pursuant to 42 U.S.C. § 1983,

against Defendants Anthony J. Annucci ("Annucci"), former Acting Commissioner of the New

York State Department of Corrections and Community Supervision ("DOCCS"); Leroy Fields,

former Superintendent of the Fishkill Correctional Facility; Stephen Urbanski, former Deputy

Superintendent of Security at Fishkill; and Akinola Akinyombo, former Deputy Superintendent

of Health at Fishkill.  Plaintiff alleges that Defendants were deliberately indifferent to his risk of

contracting COVID-19 and that they denied him adequate medical care after he contracted the

virus in violation of his Eighth Amendment rights.  (*See generally* Compl. (Dkt. No. 2).)  Before

the Court is Annucci, Fields, and Urbanski's (the "represented Defendants'") Motion to Dismiss. (*See* Not. of Mot. (Dkt. No. 20).)[1]  For the foregoing reasons, the Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are drawn from the Complaint and associated filings and are assumed to be true for the purpose of resolving the instant Motion.  *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

### 1.  Plaintiff's Confinement at Fishkill

This case revolves around Fishkill Correctional Facility's ("Fishkill's") response to the onset of the COVID-19 pandemic.  Plaintiff was incarcerated at Fishkill from the beginning of 2020 through at least the filing of his Complaint on January 24, 2023.  (*See* Compl. at 2.)

A few aspects of Fishkill's layout are relevant to this case.  Fishkill is made up of three buildings—the "main building" closest to the facility's entrance, the "21A-Building" made up of several rectangular housing units, and the "Building-21," where Plaintiff resided, which contained multiple 55-to-58-inmate dorms.  (*Id*. § IV(C)(1)–(3).)[2]  Plaintiff's dorm, "B-Center" contained one long hallway with several doorless rooms on either side.  Those rooms fit anywhere from one inmate to six inmates (in the case of Plaintiff's room) and were designed

---

[1] Defendant Akinyombo has not yet been served.  (*See* Dkt.)  The Court addresses how Plaintiff should proceed against that Defendant *infra* Section II.B.2.c.

[2] Plaintiff's Complaint uses hierarchal headings as opposed to numbered paragraphs. Given the Complaint's length, it can be difficult to tell where any particular page sits in that hierarchy, but the Court references Plaintiff's headings where possible for the sake of specificity.

either communally or as "cubicles."  B-Center also had two 12-foot-wide "shower/bathroom"

areas in addition to a 50-by-12 foot "rec room."  (*Id*. § IV(C)(4)–(8).)

Due to construction work on one of Fishkill's mess halls in or around 2020, inmates in B-

Center and six other dorms shared a relatively small mess hall. (*Id.* § IV(D)(1).)  The room,

shaped like an inverted "T," was roughly 30-feet by 40-feet and fit a maximum of 120 inmates.

(*Id*. § IV(D)(2).)  According to Plaintiff, no more than six inches usually separated inmates

regardless of where they were seated.  (*Id*. § IV(D)(6).)

## 2.  DOCCS and Fishkill's Pandemic Response

Plaintiff focuses on DOCCS and Fishkill's COVID-19 response from roughly March to

May 2020.  He begins with a March 14, 2020, memorandum in which Defendant Annucci—then

acting commissioner of DOCCS—recognized that COVID-19 infections were rising in New

York and stated that DOCCS would "swiftly impose restrictions to prevent additional spread . . .

of COVID-19 in [] correctional facilities."  (*Id*. § IV(B)(1); Appendix in Supp. of Compl.

("App.") at A1 (Dkt. No. 4).)[3]  That same document announced that all facilities would start by

---

[3] "Generally, 'when considering a motion to dismiss, the Court's review is confined to the pleadings themselves,' because 'to go beyond the allegations in the [c]omplaint would convert the Rule 12(b)(6) motion into one for summary judgment pursuant to Rule 56.'" *Garcia v. Dezba Asset Recovery, Inc*., 665 F. Supp. 3d 390, 396 (S.D.N.Y. 2023) (alterations adopted) (quoting *Thomas v. Westchester Cnty. Health Care Corp*., 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002).  Nevertheless, "the Court's consideration of documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment."  *Id*.; *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (similar).

Throughout his papers, Plaintiff refers to treatment records and policy memoranda in his Appendix, which was filed alongside the Complaint.  (*See, e.g*., Compl. at 10–11.)  The Court considers those records in deciding this Motion because the Appendix, although filed as a separate docket entry, is effectively an exhibit attached to the Complaint.  *See Thomas*, 232 F. Supp. 2d at 275; *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

suspending visitation.  (*Id.*)  Defendants Fields—who at that time served as Fishkill's Superintendent—and Urbanski implemented that directive at Fishkill, advising B-Center inmates that "all visitation and programs" would be suspended.  (Compl. at 29 n.39.)  Fields also recommended that all inmates practice social distancing on their own accord.  (*Id.* § IV(B)(2).)

In a second memorandum, dated April 1, 2020, Annucci referenced additional department-wide precautions including:  stopping intake from county jails, limiting the internal transfer of inmates, limiting the use of double bunks, instituting social distancing in congregate areas, and instituting mandatory staff screening at facility entrances.  (*See* App. at A3.)  The memorandum also provided that staff would "be permitted to wear either an N95 respirator or a surgical-type mask" on duty.  (*Id.*)

According to Plaintiff, however, Fields did not implement these policies at Fishkill. Apart from verbally advising inmates that Fishkill would suspend visitation, Fields did not "implement[] or publish" any formal COVID-19 procedures.  (*Id.* § V(A)(3)(A).)  Fields, contrary to his announcement, did not suspend facility programs, including Plaintiff's program as a gym porter, which involved interacting with staff.  (*Id.* § V(A)(3)(B).)  In addition, while Fishkill employed temperature checks, arriving staff were not consistently screened about their symptoms or off-duty activities.  (*Id.* § V(A)(3)(F).)  In fact, Plaintiff had several contacts with over-night tour officers who stated that they had contracted COVID-19 but returned to work having purportedly recovered.  (*Id.* at 33 n.51.)  And while Fields recommended social distancing, Plaintiff alleges Fields did not take steps to reduce B-Center's census, to stagger recreation or meal times, or otherwise limit inmates' use of communal spaces.  (*Id.*

§§ V(A)(3)(D), (H).)[4]  Although DOCCS did not have a mask mandate early on, Plaintiff also

faults Fields for failing to adopt one.  (*Id*. § V(A)(3)(D).)[5]

Plaintiff claims that these conditions subjected him to a high risk of COVID-19 infection,

especially considering the congregate setting in his dorm.  Substantiating that risk, he alleges that

Fishkill experienced its first COVID-19-related inmate death on March 30, 2020.  (*Id*. at 30

n.43.)  As of April 30, 2020, Fishkill had reached four COVID-19-related deaths.  (*Id*. at 23–24).

And he claims that Fishkill eventually incurred the most such deaths among all state corrections

facilities.  (*Id*. at 30 n.43.) [6]

---

[4] A different portion of Plaintiff's Complaint states that there were some precautions taken in mess halls including requiring inmates to enter single file with masks on and to sit with empty seats next to and across from themselves.  (Compl. § IV(H)(9).)  But he appears to allege that these guidelines were difficult to follow given the mess hall's size.  (*See id*. § IV(D)(6).)

[5] Plaintiff references yet another memorandum from Fields' successor imposing a limited mask mandate on August 7, 2020.  (Compl. at 25–26.)

[6] Plaintiff cites one state court decision discussing the rate of COVID-19 infections and fatalities at Fishkill compared to other correctional facilities.  *See People v. Horsey*, No. 14-6340, 2020 BL 324781, at *1 (N.Y. Sup. Ct. June 5, 2020) ("As of May 12, 2020, [Fishkill] reported 89 positive COVID-19 cases, with 5 deaths . . . [Fishkill] has 17% of all confirmed COVID-19 cases of all New York State correctional facilities.").  Although court proceedings and the documents filed therein are matters of public record, "factual findings in other court proceedings are generally not subject to judicial notice."  *B & R Supermarket, Inc. v. MasterCard Int'l Inc*., No. 17-CV-2738, 2018 WL 4445150, at *5 (E.D.N.Y. Sept. 18, 2018); *see also Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc*., 146 F.3d 66, 70 (2d Cir. 1998)  ("Facts adjudicated in a prior case do not meet either test of indisputability contained in Rule 201(b):  they are not usually common knowledge, nor are they derived from an unimpeachable source.").  The statistics Plaintiff references appear to come from a witness affidavit, *see Horsey*, 2020 WL 324781 at *1, not from an independent, judicially noticeable, source like a government website, *see Johnson v. Rockland Cnty. BOCES*, No. 21-CV-3375, 2022 WL 4538452, at *18 n.14 (S.D.N.Y. Sept. 28, 2022) (alteration adopted) (quotation marks omitted) (collecting cases) ("Fed. R. Evid. 201 permits the Court to take judicial notice of statistics and information from official government websites.").  All that is to say, the Court accepts Plaintiff's *allegation* regarding COVID fatalities at Fishkill but does not consider it to be noticeable fact.

Plaintiff also references two inmate liaison committee ("ILC") meetings between Fields and inmate representatives.  Minutes from an April 30, 2020, meeting reflect that Fields acknowledged "how deadly this virus is" and that "[m]any mistakes were made" in Fishkill's initial response to COVID-19, but that the facility was "finally able to address things in a way that was best for all concerned."  (*Id*. at 23–24; App. at A53–54.)  Plaintiff alleges that Fields then retired at some point between June 1 and August 7, 2020.  (Compl. at 24 n.36.)

### 3.  Plaintiff's COVID-19 Diagnosis

On April 1, 2020, a B-Center inmate, though not one in Plaintiff's room, was quarantined in another housing unit because he interacted with a member of Fishkill staff who tested positive for COVID-19.  (*Id*. § IV(E)(1).)  On the morning of April 2, 2020, an elderly B-Center inmate collapsed after a series of coughs and was escorted to the Regional Medical Unit ("RMU").  (*Id*. § IV(E)(2).)

A few days later, on the morning of April 6, Plaintiff did not feel well and asked his attending dorm officer to send him to the RMU.  (*Id*. § IV(E)(4).)  A nurse examined Plaintiff and advised him that, although his temperature was elevated, he did not have COVID-19.  (*Id*. § IV(E)(5).)  Medical records from the visit reflect that Plaintiff presented with a "non-productive cough" and temperature of 102.8 degrees.  (*See* App. at A12.)  Plaintiff returned to the RMU that afternoon because he had a poor appetite and felt warm.  (*Id*.)  A nurse recorded a 98.2-degree temperature and educated Plaintiff on social distancing, washing hands frequently, and covering his cough.  (*Id*.)  The nurse told Plaintiff to come back to the RMU if his condition worsened.  (*Id*.)

When Plaintiff returned from the RMU, he found that B-Center was under a two-week quarantine.  The quarantine meant that the fifty-plus B-Center inmates could not leave the

dorm—save for a medical emergency—and all had to share B-Center's common-use bathrooms and rec room.  (Compl. § IV(E)(9).)  At the start of the quarantine period, the attending dorm officer distributed blue surgical masks for inmates to wear whenever they left their rooms.[7]

Between 7:30 and 8:00 AM on April 7, Plaintiff returned to the RMU because he experienced bouts of weakness and shortness of breath.  (*Id*. § IV(E)(11).)  A staff member administered a COVID-19 swab test, and Plaintiff remained in an exam room by himself until 6:30 PM.  (*Id*.)  Records indicate Plaintiff presented with a temperature of 103.9 degrees and that he was placed in the exam room pursuant to "isolation protocols."  (App. at A12.)

Plaintiff was placed in an isolation room where he remained for three days, until April 10.  (Compl. § IV(E)(13).)  During that time, Plaintiff was without any change of clothes, means of communication, books, or television.  (*Id*.)  The lack of clothes, in particular, presented a problem as Plaintiff experienced "sudden and uncontrollable bouts of defecating on himself" and had to clean himself and his clothes with insufficient supplies.  (*Id*. § IV(E)(14).)

On April 10, Plaintiff was informed that he had tested positive for COVID-19.  (*Id*. § IV(E)(15).)  His respiratory condition worsened throughout that day and, by the time he learned of the positive test, Plaintiff was struggling to breathe and "felt that he was going to die." (*Id*. § IV(E)(16).)  At some point, Fishkill staff called an ambulance and placed Plaintiff on a stretcher where he subsequently fell unconscious.  (*Id*. § IV(E)(15).)[8]  Plaintiff's medical records

---

[7] Plaintiff alleges that Fields later changed the quarantine procedure.  Post-revision if an inmate tested positive or was exposed to someone who tested positive, that inmate and his roommates (if any) would be isolated for two weeks in one of several units reserved for quarantine.  (Compl. § IV(H)(7).)

[8] This portion of the Complaint cites Plaintiff's grievance complaint.  That document largely tracks this series of events but does not mention Plaintiff falling unconscious.  (*See* App. at A2.)

reflect that he was received at St. Luke's Hospital at 6:50 PM.  (*See* App. at A14.)  After several

tests, Plaintiff was diagnosed with a "COVID-19 pneumonia with hypoxemia" and transferred to

Mount Vernon Hospital.  (*See* Compl. §§ IV(F)(2)–(5); App. at A21.)

### 4.  Plaintiff's COVID-19 Treatment

Plaintiff remained at Mount Vernon Hospital for ten days where he had persistent fevers

and developed a MRSA infection.  (Compl. § IV(F)(9).)  He was ultimately discharged on April

23, 2020, and prescribed intravenous medicine in addition to supplemental oxygen via nasal

canula.  (*Id*. §§ IV(F)(9)–(12).)[9]  Mount Vernon Hospital also recommended "isolation

precautions."  (*Id*. § IV(F)(10) (alteration adopted).)  Upon his return, Plaintiff remained at the

RMU until May 12, 2020.  (*Id*. § IV(G)(1).)

Although Plaintiff had received a medical gown at Mount Vernon Hospital, he wore his

old clothes after he returned to Fishkill—the same clothing he wore when he initially arrived at

the RMU on April 7.  (*Id*. § IV(G)(2).)  Plaintiff still experienced bouts of defecation, some

while resting and sleeping, and had to wash his underwear in a small sink with few supplies; a

task made more difficult given Plaintiff's weakness and physical limitations.  (*Id*.)

Because of Mount Vernon's recommendation, Plaintiff spent most of his return to the

RMU in "isolation confinement."  (*Id*. § IV(G)(6).)  The prolonged isolation made Plaintiff feel

abandoned and caused Plaintiff to relive his "near-death experience," resulting in frequent panic

attacks.  (*Id*. § IV(G)(7).)  Plaintiff eventually returned to B-Center on May 12, 2020.  (*Id*.

§ IV(G)(10).)  He alleges his release back into general population had to be (and was) approved

by "DSH [and] DSS," acronyms that refer to Defendant Akinyombo (the Deputy Superintendent

---

[9] Plaintiff describes his prescriptions and their purpose in considerable detail.  (*See*
Compl. at 15 n.23.)

of Health Services), Defendant Urbanski (the Deputy Superintendent of Security), and "ICN,"

the Infectious Control Nurse.  (*Id*.)[10]

### B.  Procedural History

On September 11, 2023, Represented Defendants filed a pre-motion letter in anticipation

of the instant Motion.  (*See* Dkt. No. 18.)  The Court adopted a briefing schedule in lieu of a pre-

motion conference.  (*See* Order (Dkt. No. 19.)

Pursuant to that schedule, Defendants filed the instant Motion on October 23, 2023.  (Not

of Mot.; Mem. of Law in Supp. of Rep. Defs' Mot. ("Defs' Mem.") (Dkt. No. 21).)  Plaintiff

filed his Opposition on February 6, 2024, (Mem. of Law in Opp. to Mot. ("Pl's Mem.") (Dkt.

No. 24)),[11] and, after an extension, (*see* Dkt. No. 26), Defendants replied on March 1, 2024,

(Reply Mem. of Law in Supp. of Mot. ("Defs' Reply") (Dkt. No. 27)).

---

[10] Plaintiff states that, due to the harrowing ordeal, he was never in a position to note the names of each staff member, nurse, or doctor "directly [or] indirectly responsible (i.e.[,] 'personally involved') [in] any phase(s) of his treatment (or, lack thereof)."  (Compl. at 39 n.58.) He therefore only alleges claims against Akinyombo and Urbanski arising out of the events discussed in this section.

[11] Plaintiff requested an extension of his original November 22, 2023, filing deadline so that he could file an amended complaint.  (*See* Letter from Terrell Zeigler to Court (Nov. 21, 2023) (Dkt. No. 22).)  That request remains pending, (*see* Dkt.), and Plaintiff, instead of amending, filed his Opposition on February 6, 2024.  Defendants did not object to his untimely filing or seek to deem the Motion fully submitted.  Given Plaintiff's pro se status, his timely extension request, and the lack of any prejudice to Defendants, the Court "will proceed as if its acceptance of the [Opposition] for filing constituted nunc pro tunc approval of [its] content." *Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr*., No. 12-CV-974, 2015 WL 5729969, at *22 (S.D.N.Y. Sept. 30, 2015); *see also In re Ford Fusion & C-Max Fuel Econ. Litig*., No. 13-MD-2450, 2015 WL 7018369, at *10 (S.D.N.Y. Nov. 12, 2015) (deeming amended complaint timely filed nunc pro tunc).

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil

Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it

tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation

marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to

relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of

facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege

"only enough facts to state a claim to relief that is plausible on its face," *id.* at 570.  However, if

a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ]

complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a

complaint states a plausible claim for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense.  But where the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second

alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule

8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a

10

prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same). But when a plaintiff proceeds pro se, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint." *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted). Moreover, where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quotation marks omitted). Notwithstanding a standard of review comparatively more lenient and favorable to pro se litigants, such treatment "does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d

Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and citation omitted)).

### B.  Analysis

Plaintiff alleges that Defendants subjected him to cruel and unusual conditions of confinement and denied him adequate medical care in violation of his Eighth Amendment rights. The Court begins by reviewing applicable Eighth Amendment principles and then examines the extent to which they apply to any of the represented Defendants.  It concludes that Fields plausibly violated Plaintiff's rights by acting with deliberate indifference to a substantial risk that he would be infected with COVID-19.  However, the other Defendants either were not deliberately indifferent or were not involved in any violation of Plaintiff's constitutional rights.

### 1.  Applicable Eighth Amendment Principles

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.[12]  Relevant to this case, that broad proscription extends to a prison official's "deliberate indifference to serious medical needs of prisoners."  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

To successfully state a constitutional violation based on such deliberate indifference, an inmate must plausibly allege (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that the defendants "acted with deliberate indifference."  *Feliciano v.*

---

[12] Claims of unconstitutional conditions of confinement arise under different constitutional provisions depending on a plaintiff's status.  The claims of convicted prisoners are governed by the Eighth Amendment's Cruel and Unusual Punishments Clause, while claims of pretrial detainees are "governed by the Due Process Clause of the Fourteenth Amendment."  *See, e.g.*, *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).  The Court applies Eighth Amendment caselaw here because Plaintiff alleges that he was a "state-convicted prisoner" during the events giving rise to this Action.  (Compl. at 2.)

*Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017).  The first

element is "objective" and requires that a plaintiff show that the "alleged deprivation of adequate

medical care [is] sufficiently serious."  *Spavone*, 719 F.3d at 138 (citation and quotation marks

omitted).  While "[t]here is no settled, precise metric" for "seriousness," *Brock v. Wright*, 315

F.3d 158, 162 (2d Cir. 2003), a plaintiff must ultimately "show that the conditions, either alone

or in combination, pose an unreasonable risk of serious damage to his health," *Walker v. Schult*,

717 F.3d 119, 125 (2d Cir. 2013) (citation omitted).  "The second requirement is subjective:  the

charged officials must be subjectively reckless in their denial of medical care.  This means that

the charged official must act or fail to act while *actually aware* of a substantial risk that serious

inmate harm will result."  *Barnes v. Uzu*, No. 20-CV-5885, 2022 WL 784036, at *11 (S.D.N.Y.

Mar. 15, 2022) (alteration adopted) (quoting *Spavone*, 719 F.3d at 138).  Awareness, in this

context, "may be proven from the very fact that the risk was obvious."  *Id.*

In addition to being free from indifference to medical needs, inmates have the right to

physical conditions of confinement that do not "involve the wanton and unnecessary infliction of

pain."  *Stapleton v. Pagano*, No. 19-CV-952, 2020 WL 4606320, at *5 (S.D.N.Y. Aug. 11, 2020)

(quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  However, inmates do not have a right

to "comfortable" prison conditions.  *Id.* at 349.  Thus,

> [t]o state an Eighth Amendment claim based on conditions of confinement, an
> inmate must allege that: (1) objectively, the deprivation the inmate suffered was
> sufficiently serious that he was denied the minimal civilized measure of life's
> necessities, and (2) subjectively, the defendant official acted with a sufficiently
> culpable state of mind, such as deliberate indifference to inmate health or safety.

*Walker*, 717 F.3d at 125 (citation, alteration, and quotation marks omitted).  "To meet the

objective element, the inmate must show that the conditions, either alone or in combination, pose

an unreasonable risk of serious damage to his health."  *Id.* (citations omitted); *see also*

*Seymore v. Dep't of Corr. Servs.*, No. 11-CV-2254, 2014 WL 641428, at *3 (S.D.N.Y. Feb. 18,

2014) ("[T]he Second Circuit . . . has explained that [b]ecause society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement claim.'" (alteration in original) (internal quotation marks and citation omitted)).  To meet the subjective element, a plaintiff must show that the defendant "acted with more than mere negligence," and instead knew of and disregarded an "excessive risk to inmate health or safety." *Walker*, 717 F.3d at 125 (citations and quotation marks omitted).

Additionally, "[i]t is well settled that, in order to establish a defendant's individual liability in a suit brought under [Section] 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Gibson v. Mount Vernon Montefiore Hosp. Exec. Dir*., No. 22-CV-4213, 2024 WL 1217528, at *10 (S.D.N.Y. Mar. 19, 2024) (same). "[A] plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quotation marks omitted) (explaining that "a plaintiff may not rely on a special test for supervisory liability"); *see also Taranto v. Putnam County*, No. 21-CV-2455, 2023 WL 6318280, at *13 (S.D.N.Y. Sept. 28, 2023) (same).

Based on that requirement, the Second Circuit has recognized five theories of personal involvement for supervisory officials:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Haughey v. Cnty. of Putnam*, No. 18-CV-2861, 2022 WL 4468066, at *17 (S.D.N.Y. Sept. 26, 2022) (quoting *Grullon*, 720 F.3d. at 139 (alterations, italics, and quotation marks omitted)). Plaintiff alleges that Annucci, Akinyombo, and Urbanski are all supervisory officials, (Compl. at 1), and therefore must plead conduct by each individual Defendant that "falls into one of the five categories identified above." *Falls v. Pitt*, No. 16-CV-8863, 2018 WL 3768036, at *6 (S.D.N.Y. Aug. 8, 2018).

### 2.  Application

Plaintiff alleges three distinct deliberate indifference theories: (1) that Fields and Annucci were deliberately indifferent to a substantial risk that Plaintiff would contract COVID-19, (Compl. §§ V(A), (B)); (2) that Akinyombo denied him adequate medical care, (*id*. § V(C)); and (3) that Akinyombo and Urbanski subjected him to cruel and unusual conditions of confinement while he was being treated for COVID-19, (*id*. § V(D)).  Defendants respond that Plaintiff has not satisfied either portion of the deliberate indifference test for any of these claims and that, in any event, none of the represented Defendants was personally involved in alleged violations of Plaintiff's constitutional rights.  (*See generally* Defs' Mem.)

### a.  Fields

The Court begins with Plaintiff's conditions-of-confinement claim against Fields. Plaintiff presents a bevy of allegations that can best be summed up as:  Fields knew of the high risk of COVID infection at Fishkill but failed to act or follow recommended precautions until it was too late.  (*See* Compl. § V(A); Pl's Mem. 9–12.)

### i.  Objective Prong

Starting with the objective prong, "there is no question that an inmate can face a substantial risk of serious harm in prison from COVID-19 if a prison d[id] not take adequate

measures to counter the spread of the virus." *Chunn v. Edge*, 465 F. Supp. 3d 168, 200

(E.D.N.Y. 2020). The Second Circuit has long "recognized that 'correctional officials have an

affirmative obligation to protect inmates from infectious disease.'" *Caraballo v. Dep't of Corr.

City of New York*, No. 22-CV-971, 2022 WL 16555313, at *4 (S.D.N.Y. Oct. 31, 2022) (quoting

*Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)). And, as numerous courts have held,

protection from COVID-19 falls squarely within the scope of that duty. *See Fernandez-

Rodriguez v. Licon-Vitale*, 470 F. Supp. 3d 323, 349 (S.D.N.Y. 2020) (collecting cases); *see also

Coronel v. Decker*, No. 20-CV-2472, 449 F. Supp. 3d 274, 281–83 (S.D.N.Y. Mar. 27, 2020)

(same). Because "this is a case about prison conditions," however, any risk of serious harm

"must be determined after accounting for the protective measures [Fishkill] ha[d] taken" at the

time. *See Fernandez-Rodriguez*, 470 F. Supp. 3d at 349 (internal quotation marks omitted)

(quoting *Chunn*, 465 F. Supp. 3d at 200); *see also Latimer v. Annucci*, No. 21-CV-1275, 2023

WL 6795495, at *4 (S.D.N.Y. Oct. 13, 2023) (same).

Plaintiff plausibly alleges that the conditions at Fishkill posed a substantial risk to his

health, despite countermeasures the facility may have taken. To start, Plaintiff alleges that he

faced a particular risk of infection due to the "communal layout of B-Center" where he resided in

a four-person room and shared showers, bathrooms, recreation spaces, and a cramped mess hall

with fifty-five-to-fifty-eight other inmates. (Compl. § V(A)(3)(H).) Despite that tightly packed

setting, Plaintiff claims that Fishkill did not implement any social distancing procedures at the

outset of the pandemic or attempt to stagger meal and recreation times. (*Id*. § V(A)(3)(D).)

Plaintiff also alleges that Fishkill maintained several programs where he moved around the

facility and interacted with DOCCS staff. Those staff, in turn, were allegedly subject to cursory

screening procedures that did not account for their off-duty contacts. (*Id*. § V(A)(3)(F).) As to

his own experience with screening, Plaintiff claims that, in addition to not providing regular sick-call service, medical staff advised that he did not have COVID-19 despite presenting with obvious symptoms.  (*Id*. § IV(E)(6).)  Compounding those oversights are allegations of lackluster quarantine procedures where, instead of isolating exposed inmates in B-Center, Fishkill prevented *any* inmates from leaving the dorm, confining them to the same communal spaces for two weeks.  (*Id*. § IV(E)(9).)  That created a situation where, if just a single inmate fell ill, the virus could spread quickly to the rest of the dorm.  *See Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 439 (D. Conn. 2020) (finding that the "structure of the three facilities [at issue] . . . heighten[e]d the risk of transmission" "even assuming that all reasonable precautions and safety measures [were] being observed").  Those allegations—which alone demonstrate a significant risk of exposure—are all the more severe given the death of a B-Center inmate from COVID-19 just days before Plaintiff himself fell ill.

Defendants resist focusing on the measures Fishkill purportedly adopted, including restricting visitation, distributing masks, responding to sick calls, and quarantining exposed inmates.  (Defs' Mem. 6–7.)  Their initial assertion is that Plaintiff's reference to these measures, alone, contradicts his allegations of objective risk.  (*See id*.)  But the Court finds those allegations entirely consistent with Plaintiff's claim.  Viewed most favorably, Plaintiff argues that although Fields adopted certain measures, Fields failed to take necessary and obvious steps to reduce the risk of infection in crowded parts of the prison.  (*See* Compl. § V(A)(3)(H).)  Discovery may demonstrate that any such risk was not substantial under the circumstances.  Yet, at this early stage, Defendants have not articulated why Fields' policies were enough to mitigate the particular danger alleged here.  (*See* Defs' Mem. 6–7.)  Moreover, while Fishkill may have nominally adopted these policies, Defendants do not engage with Plaintiff's claims that the

17

policies were not consistently enforced. (*See generally* Compl § V(A)(3).) The effectiveness of those measures is also belied by Plaintiff's allegation regarding the high number of COVID-related inmate deaths at Fishkill compared to other facilities. *See Chunn*, 465 F. Supp. 3d at 205 (stating, as of June 9, 2020, that "MDC has had no COVID-connected fatalities and only one COVID-linked hospitalization"); *see also Fernandez-Rodriguez*, 470 F. Supp. 3d at 351 (noting, as of July 7, 2020, that "MCC has been spared deaths among its inmate population and staff").

Defendants do some more work in reply. (*See* Defs' Reply 3–5.) But that discussion largely relates to department-wide policies adopted by Defendant Annucci, (*see* Defs' Reply 3–4)—the same policies Fields allegedly failed to fully implement at Fishkill. In terms of Fishkill-specific policies, the cited measures—including establishing a cleaning schedule, updating quarantine policy, and a renewed focus on social distancing—arise out of an April 30, 2020, meeting and post-date Plaintiff's alleged near-death episode. (*Compare infra* § I.A.3, *with* Defs' Reply 3–4.) Rather than detracting from Plaintiff's claim, that timeline underscores his theory of the case—that Fields was flat-footed in responding to an obvious risk of transmission at the outset of the pandemic. (*See* Compl. § V(A)(3) (alleging that Fields' response was "an [un]timely one").) Of course, Defendants may argue in later stages of this case that the Court should focus on the totality of their COVID-19 response, as opposed to the response in this initial period.

Plaintiff's claim therefore passes this initial step of the analysis—a finding in line with similar cases, one of which examined the exact circumstances at issue here. *See Houston v. Capra*, No. 20-CV-2135, 2022 WL 748260, at *8 (S.D.N.Y. Mar. 11, 2022) ("Plaintiff plausibly alleges conditions-of-confinement claims arising from Fishkill's S200 [quarantine] policy . . . ."); *see also Gil-Cabrera v. Dep't of Corr.*, No. 20-CV-9493, 2021 WL 5282620, at *4 (S.D.N.Y.

Sept. 27, 2021) (concluding that allegations regarding the risk of COVID transmission "in [plaintiff's] housing area" satisfied the objective prong of the Eighth Amendment analysis), *report and recommendation adopted sub nom*. *Gil-Cabrera v. City of New York*, 2021 WL 5910055 (S.D.N.Y. Dec. 14, 2021); *see also Fernandez-Rodriguez*, 470 F. Supp. 3d at 351 (stating "[m]any courts have found that prisons exposed to the novel coronavirus present conditions that meet the objective prong of the constitutional analysis" and collecting cases).

### ii.  Subjective Prong

The Court next considers the subjective prong of the Eighth Amendment analysis—whether Fields was deliberately indifferent to Plaintiff's risk of COVID-19 exposure.  As outlined above, deliberate indifference means that officials were both subjectively aware of a substantial risk to inmate health, and that "they disregard[ed] that risk by failing to take reasonable measures to abate it."  *See Fernandez-Rodriguez*, 470 F. Sup. 3d at 352; *see also Farmer v. Brennan*, 511 U.S. 825, 844 (1994) ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

Here, based on Plaintiff's allegations, the Court concludes that he has plausibly claimed that Fields was plausibly aware of, and disregarded, the risk Plaintiff faced.  As a baseline, Fields was obviously aware that COVID had "infiltrated" the facility—an allegation confirmed by contemporaneous policy statements.  (Compl. § IV(B)(2) (incorporating March 19, 2020, memoranda where Fields discusses Fishkill's COVID-19 procedures).)  Further, Plaintiff alleges that Fields was personally aware of the congregate conditions in B-Center from regular dorm walk throughs.  (*Id*. § V(A)(3)(H) & n.52.)  It is less clear how much Fields knew about the effectiveness of facility policy.  But Plaintiff presents material to mitigate that issue.  Deliberate indifference "may be inferred from circumstantial evidence."  *Young v. Choinski*, 15 F. Supp. 3d

194, 199 (D. Conn. 2014) (quotation marks omitted), and here, Plaintiff points to objective evidence of risk, namely the early death of an inmate from COVID, and Fields' purported admission that "mistakes were made" at the outset of the pandemic.  The inmate fatality—which again was the exception among New York prisons—was obvious evidence of the risk of infection, and "the very fact that the risk was obvious" is itself sufficient to allege Fields' subjective "awareness."  *Spavone*, 719 F.3d at 138 (quoting *Farmer*, 511 U.S. at 842).  In response, Plaintiff claims that Fields did not limit inmate interaction within B-Center and continued programs where different parts of the prison co-mingled.  (Compl. §§ V(A)(3)(B), (H).)  He also alleges that Fields made those conditions worse by quarantining an entire dorm of potentially exposed inmates, forcing them to use the same common spaces.  (*Id*. § IV(E)(9).)  Finally, to the extent Fields did adopt certain measures, Plaintiff claims he did so in name only. (*Id*. § V(A)(3)(A).)

In response, Defendants contend that Fields', and by extension Fishkill's, response to that risk was reasonable even if it was ineffective.  (Defs' Mem. 6–7, 11–13.)  But apart from listing things Fishkill did, they provide no basis to conclude that those measures were reasonable under the circumstances.  The only discernable barometer is a citation to *Gibson v. Rodriguez*, No. 20-CV-953, 2021 WL 4690701, at *6 (D. Conn. Oct. 7, 2021), which held that implementing CDC-recommended measures negated any finding of deliberate indifference.  Yet Defendants do not point to material in the Complaint to demonstrate that Fishkill's response followed CDC guidelines.  Defendants go on to cite several cases where courts dismissed deliberate indifference allegations based on a facility's COVID procedures.  (*See* Defs' Mem. 6–7, 11–13; *see also* Defs' Reply 6–7 (same).)  The problem with those cases, however, is that they either arise in postures with a higher burden on Plaintiff or involve conclusory allegations unlike the detailed

allegations in the Complaint. *See James v. Annucci*, No. 20-CV-6952, 2021 WL 3367530, at *7

(W.D.N.Y. Aug. 3, 2021) ("sparse" and "conclusory" allegations of deliberate indifference failed

to state a claim); *Herbert v. Smith*, No. 20-CV-6348, 2020 WL 5898977, at *3 (S.D.N.Y. Oct. 5,

2020) (order of service rejecting "vague" allegations of deliberate indifference); *Dzhabrailov v.

Decker*, No. 20-CV-3118, 2020 WL 2731966, at *4 (S.D.N.Y. May 26, 2020) (denying "facially

and fatally flawed" motion for injunctive relief including release from prison).  In other words,

they do not establish that the responses at issue were reasonable.  And even if those measures

could be seen as reasonable, the Court is unwilling to reach that conclusion as a matter of law

given Plaintiff's allegations that Fields' policies were not actually implemented.  Provided

Plaintiff is correct—as must be assumed at this stage—Fields could still be indifferent despite

purportedly enacting several precautions.  *See Pierce v. Rodriguez*, No. 20-CV-1755, 2023 WL

2646825, at *11 (D. Conn. Mar. 27, 2023) (holding fact dispute "as to whether Osborn's

COVID-19 precautions relating to the isolation of infected inmates were being followed"

precluded judgment on deliberate indifference).[13]

Before moving on, the Court emphasizes the preliminary nature of its holding.  It finds

only that Plaintiff has plausibly alleged Fields' indifference to a specific and significant risk of

COVID-19 transmission.  The Court is acutely aware of the difficulties and uncertainties

involved in COVID-19 precautions, especially at the outset of the pandemic.  And discovery may

---

[13] The Court's conclusion that Fields, himself, acted with deliberate indifference
necessarily establishes his personal involvement.  *See Tangreti*, 983 F.3d at 619 (explaining that,
to establish personal involvement, "[the plaintiff] must show that [the prison-official-defendant]
herself 'acted with deliberate indifference'—meaning that [the official-defendant] personally
knew of and disregarded an excessive risk to [the plaintiff's] health or safety" (quoting *Vega v.
Semple*, 963 F.3d 259, 273 (2d Cir. 2020))).  It does not rely on any argument that Fields is a
"distinct class of agent," (*see* Pl's Mem. 10 (quoting *Vance v. Ball State Univ*., 570 U.S. 421,
440 (2013)), or any other "special test for supervisory liability," *Tangreti*, 983 F.3d at 616.

yet reveal that Fields merely demonstrated "[s]hortfalls in the immediate implementation of [COVID-19] guidelines"—as opposed to "knowing disregard" of risk—and that he, at most, acted negligently.  *See Chunn*, 465 F. Supp. 3d at 205.

### b.  Annucci

Unlike his claim against Fields, Plaintiff's allegations against Annucci fall short of deliberate indifference.

The contrast starts with Annucci's alleged knowledge and conduct.  Plaintiff makes several allegations regarding Annucci's general knowledge that COVID may spread in New York prisons, including Fishkill.  (Compl. §§ V(B)(1)–(3).)  However, he does not claim that Annucci knew of the particular risks at Fishkill regarding inmate congregation and the like.  (*See generally id.* § V.)  Nor does he present circumstantial allegations of Annucci's knowledge like complaints or reports coming out of that facility.  (*See id.*)  In light of that high-level knowledge of COVID-19 risks—which was undoubtedly serious—Plaintiff alleges four examples of deliberate indifference: (1) that on March 14, 2020, Annucci "merely" suspended visitation; (2) that, as of March 14, 2020, he failed to require corrections personnel or inmates to wear masks or to implement social distancing; (3) that, on April 1, 2020, after the first COVID-related death of an inmate at Fishkill, he provided access to personal protective equipment (PPE), as opposed to *requiring* its use throughout DOCCS facilities; (4) that Annucci did not properly supervise Fields' facility-level COVID response, which resulted in inconsistent mask use among Fishkill staff.  (*Id.* §§ V(B)(4)(A)–(E).)

Those allegations fail to demonstrate that Annucci "intentionally imposed the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition imposed."  *Caraballo*, 2022 WL 16555313, at *5 (alterations adopted) (quoting *Darnell*, 849

F.3d at 35).  In alleging what Plaintiff believes to be inadequate department-wide COVID countermeasures, he catalogues several affirmative steps Annucci took to protect both inmates and staff.   The relevant portions of the Complaint, reflect that as early as March 14, 2020, Annucci directed corrections facilities to limit visitation, thereby reducing the risk COVID would be introduced to the general population.  (*See* Compl. § IV(B)(1).)  Plaintiff also quotes an April 1, 2020, memorandum from Annucci stating that DOCCS took various steps to limit intra-facility transmission including providing PPE, allowing staff to wear N95 respirators, implementing contact tracing, and directing quarantined inmates be provided masks to "reduce the risk of any secondary transmission." (*Id.* § V(B)(3) (quoting App. at A3–4).)  While Plaintiff characterizes these memoranda as "direct[ing]" staff "*not* to wear face masks," (*Id.* § V(B)(4)(D) (emphasis added)), the documents state that mask use was permitted, apparently beyond Centers for Disease Control and Department of Health requirements at the time, (*see* App. at A3–4).  Far from expressing indifference, these allegations demonstrate that Annucci acknowledged the general threat of COVID-19 and took several actions in response.  Plaintiff does not allege that the claimed gaps in those measures, like the failure to mandate mask use, *themselves* posed an excessive risk to his health.  And to the extent Annucci's high-level policies were inadequate, his errors at best amount to negligence in the face of "shifting parameters and guidance regarding how to combat a previously little[-] known virus,' rather than consciously turning a blind eye to any known danger." *Chunn*, 465 F. Supp. 3d at 204 (quoting *Money v. Pritzker*, 453 F. Supp. 3d 1103, 1131 (N.D. Ill. 2020)).

Plaintiff also relies on allegations that Annucci "'did not properly superintend[] the discharge of' [D]efendant Fields' duties."  (Compl. § V(B)(4)(E); *see also* Pl's Mem. 12 (same).)  But that phrase, without more, is just a conclusory assertion of supervisory liability.  Recall that

Second Circuit precedent requires allegations that each official-defendant, himself, violated the constitution. In the Eighth Amendment context, that means a supervisor must be subjectively aware of a subordinate's unconstitutional conduct and turn the other way; "it is not enough" for a supervisor to be "negligent, or even grossly negligent, in h[is] supervision of the correctional officers." *See Tangreti*, 983 F.3d at 620. And the Complaint simply lacks those allegations. Other than labeling Fields as Annucci's "proxy," (*see* Pl's Mem. 12), Plaintiff does not claim that Annucci actually participated in Fields' allegedly "wrongful acts," *see Haughey*, 2022 WL 4468066, at *17. Nor does he claim that Annucci was ever made aware of Fields' particular missteps, or that he otherwise failed to address complaints of unconstitutional conditions at Fishkill. Plaintiff likewise does not allege that Annucci "dr[e]w the inference" that Fields was deliberately indifferent based on available information about Fishkill. *See Farmer*, 511 U.S. at 837 (1994) ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). Insofar as Plaintiff relies on Annucci's purported policy of "delaying the immediate use of face masks [by] all of Fields' subordinates," that allegation is contradicted by the memoranda Plaintiff cites, (*see* Compl. § V(B)(3) ("[S]taff will be *permitted* to wear either a[] N95 respirator or a surgical-type mask while on duty . . . .") (emphasis in original)), and it does not rise to the level of deliberate indifference for the reasons stated in the previous paragraph. The Court therefore dismisses Plaintiff's claim against Annucci.

### c. Akinyombo

The Court recognizes that Plaintiff alleges claims against Akinyombo, (*see generally id.* § V), and Plaintiff understandably wonders why Defense counsel does not "engage with any of Plaintiff's factual allegations" as to Akinyombo. (Pl's Mem. 13.) The answer is that

Akinyombo has not been served and thus has not filed a motion to dismiss. (*See* Defs' Mem. 1 n.1; *see* Dkt. No. 14)

Plaintiff, proceeding in forma pauperis, is entitled to "rely on the Marshals to serve the relevant parties." *See Meilleur v. Strong*, 682 F.3d 56, 63 (2d Cir. 2012); *see also* 28 U.S.C. § 1915(d) ("The officers of the court shall issue and serve all process . . . in [IFP] cases."). But if "it becomes apparent that the Marshals [did] not accomplish [service] by the Rule 4(m) or court-ordered deadline, [the plaintiff] must advise the district court that [he] is relying on the Marshals to effect service and request a further extension of time for them to do so." *Meilleur*, 682 F.3d at 63; *see also Brooks v. Educ. Bus Transp*., No. 14-CV-3237, 2015 WL 7012924, at *8 (E.D.N.Y. Nov. 12, 2015) ("[A]lthough a plaintiff's in forma pauperis status may relieve her of the burden to personally serve the defendants, she cannot stand idle upon learning that the efforts by the [USMS] to serve a particular defendant have been unsuccessful." (internal quotation marks omitted)). Although failure to serve can be grounds for dismissal, a district court must first "giv[e] notice to the plaintiff and provid[e] an opportunity for [him] to show good cause for the failure to effect timely service." *Meilleur*, 682 F.3d at 61; *see also Kotler v. Boley*, No. 17-CV-239, 2021 WL 2209874, at *1 (S.D.N.Y. June 1, 2021) (same).

The deadline to serve has come and gone, but Plaintiff clearly intends to pursue claims against Akinyombo. (*See* Pl's Mem. 13–14.) Accordingly, "the Court provides notice that Plaintiff must within 30 days request an extension of time to serve [Akinyombo] or his claims against th[is] [u]nserved [d]efendant[] may be dismissed." *See Miller v. Annucci*, No. 17-CV-4698, 2021 WL 4392305, at *8 (S.D.N.Y. Sept. 24, 2021). In the event Plaintiff requests an extension, counsel for Defendants should be prepared to respond promptly to a *Valentin* order, as it appears Akinyombo could not be served at the address in the Court's records. *See Valentin v.*

*Dinkins*, 121 F.3d 72, 76 (2d Cir. 1997).  (*See also* Dkt. No. 14 (Marshal's service receipt stating Akinyombo was not at the listed address and "legal counsel would not accept service on [his] behalf").)

### d.  Urbanksi

Plaintiff also alleges that Urbanski was deliberately indifferent to his conditions of confinement.  (Compl. § V(D).)  His claim is that he was deprived of the ability to communicate with his family while awaiting treatment at Fishkill and that his hygienic needs were not met—including that he was not given new clothes to replace the ones he soiled as a result of COVID-induced gastrointestinal issues and that he was made to sleep in his own feces.  (*Id*. § V(D)(b).) Plaintiff also alleges that these issues, particularly the hygiene concerns, worsened when he returned from Mount Vernon Hospital with several medical tubes which restricted his mobility. (*Id*. § V(D)(d).)  Defendants respond that hygiene-based allegations are generally insufficient to state a claim, (Defs' Mem. 9–10), and that Plaintiff failed to allege Urbanksi's personal involvement, (*id*. at 11).

While the Court ultimately finds that Urbanki was not personally involved, it briefly considers Defendants' legal arguments about hygienic prison conditions.  Defendants' position, albeit expressed briefly, appears to be that allegations "hygienic in nature . . . do not []rise to a constitutional violation."  (Defs' Mem. 10.)  In addition to being incorrect, Defendants' argument comes off as particularly callous given the "degrading" context of exposure to human waste.  *See Willey v. Kirkpatrick*, 801 F.3d 51, 67 (2d Cir. 2015) (quotation marks omitted).  The Second Circuit has held, repeatedly, that exposure to bodily waste in the confines of a prison cell may give rise to an Eighth Amendment violation.  *See id*. (collecting cases); *see also Gaston v. Coughlin*, 249 F.3d 156, 166 (2d Cir. 2001) ("We are unwilling to adopt as a matter of law the

principle that it is not cruel and unusual punishment for prison officials knowingly to allow an area to remain filled with sewage and excrement for days on end."); *LaReau v. MacDougall*, 473 F.2d 974 (2d Cir. 1972) ("Causing a man to live, eat[,] and perhaps sleep in close confines with his own human waste is too debasing . . . to be permitted."). And those circumstances differ in kind from other merely "uncomfortable" situations Defendants cite like the temporary deprivation of toiletries. (Defs' Mem. 10 (citing *Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003).) Moreover, the Second Circuit has expressly declined to adopt the sort of rule Defendants gesture at here, i.e., that "there some minimal level of grotesquerie required" to violate the Eighth Amendment. *Wiley*, 801 F.3d at 68.

Nevertheless, despite the undignified conditions Plaintiff alleges he faced, he does not plead Urbanski's personal involvement. His only mention of Urbanski is that Urbanksi was required, after consultation with an Infectious Control Nurse, to approve Plaintiff's removal from quarantine and reentry into general population in May 2020. (Compl. §§ V(D)(e)(1)–(3).) Reasoning backwards, Plaintiff claims that because Urbanksi knew he was quarantined, he either knew, or should have known, of "Plaintiff's aggregate conditions of confinement." (*See id*.; Pl's Mem. 13 (incorporating allegations in Complaint).) There are two problems with this line of reasoning. First, personal involvement requires a plaintiff allege knowledge of unconstitutional conditions at the time they occurred; "allegations about events '*after* a constitutional violation has already occurred' do not establish personal involvement in the underlying violation." *Corines v. Cnty. of Westchester*, No. 22-CV-5179, 2024 WL 1257093, at *8 (S.D.N.Y. Mar. 25, 2024) (quoting *Weston v. Bayne*, No. 22-CV-621, 2023 WL 8435998, at *6 (N.D.N.Y. June 28, 2023)). Urbanksi only entered the equation at the end of Plaintiff's treatment when he approved Plaintiff's removal from allegedly unsanitary conditions. There are no allegations about his

knowledge, not to mention his contribution to, squalid conditions in April 2020.  At best, Plaintiff has alleged that Urbanski *should have* known about conditions in quarantine.  But that leads to the second problem, which is that Plaintiff must allege that Urbanksi was "subjectively aware" of the alleged conditions.  *See Tangreti*, 983 F.3d at 620 (quoting *Farmer*, 511 U.S. at 829).  Even if Urbankski was negligent or reckless in supervising the RMU, nothing in the Complaint alleges he was made aware of the facts giving rise to Plaintiff's claim.  Accordingly, Plaintiff's claim against Urbanski is dismissed.  *See Corines*, 2024 WL 1257093, at *8 (dismissing claims against officials who did not receive notice until "after a constitutional violation . . . occurred" (quotation marks and italics omitted)); *Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) ("Receiving post hoc notice does not constitute personal involvement in the unconstitutional activity . . . ."); *see also Valverde v. Folks*, No. 19-CV-8080-MKV, 2020 WL 5849515, at *11 (S.D.N.Y. Sept. 30, 2020) (holding that a plaintiff "failed to establish personal involvement by [the defendant] because [the p]laintiff ha[d] not alleged that he suffered from an ongoing constitutional violation that [the defendant] could have remedied").  That dismissal is without prejudice to Plaintiff filing an amended complaint alleging claims against any of the "medical-staff member[s]" involved in his treatment.  (*See* Compl. at 39 n.58.)

### 3.  Qualified Immunity

Defendants also argue that they are entitled to qualified immunity.  (Defs' 11–13.)  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks omitted).  A government official will therefore be protected from liability "where (1) his conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Hayes v. Condlin*, No. 22-CV-7295, 2024 WL 776082, at *6 (S.D.N.Y. Feb. 26, 2024) (internal quotation marks omitted) (quoting *Delgado v. City of New York*, No. 19-CV-6320, 2023 WL 6390134, at *7 (S.D.N.Y. Oct. 2, 2023)); *accord Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007).

Defendants' brief provides little more than a recitation of the doctrine's elements, a conclusory statement that the law in these circumstances is not clearly established, and a string cite of purportedly related cases. (Defs' Mem. 12–13 (citing, e.g., *James*, 2021 WL 3367530, at *8).) As Plaintiff points out, qualified immunity is an affirmative defense. *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007). That makes it "incumbent upon the defendant to plead, and adequately develop, [the] defense during pretrial proceedings." *Id.* (quoting *Blissett v. Coughlin*, 66 F.3d 531, 538 (2d Cir. 1995)). Defendants do not even attempt to engage with relevant Eighth Amendment precedent. And their skimpy argument, without more, cannot carry their burden at the pleading stage. *See Ziemba v. Lynch*, No. 11-CV-974, 2013 WL 5232543, at *9 (D. Conn. Sept. 17, 2013) (denying to apply qualified immunity where the defendant "only include[d] the legal standard for establishing qualified immunity and, in a conclusory manner, state[d] that the claims . . . are subject to dismissal based on [that] law"); *see also Harris v. McAlistor*, No. 22-CV-75, 2023 WL 5830337, at *10 (W.D.N.Y. Sept. 8, 2023) (denying qualified immunity where defendants offered "the conclusory assertion that their conduct was reasonable" (internal quotation marks omitted)); *A.S. v. City Sch. Dist. of Albany*, 585 F. Supp. 3d 246, 280 (N.D.N.Y. 2022) ("The [] [d]efendants' conclusory, one-sentence argument fails to demonstrate how they are entitled to qualified immunity at the pleadings stage.").

What's more, as Plaintiff's detailed research reveals, none of the cases cited by Defendants even mentions clearly established law.[14]  Rather, they just present various situations where plaintiffs failed to state claims.  By contrast, the cases that actually do address the question have concluded that the clearly established law analysis in this context is highly fact-dependent, turning on the particular risk of infection at the relevant facility.  *See Pierce*, 2023 WL 2646825, at *12 ("A reasonable jury . . . could find that [d]efendants' decision to transfer [the p]laintiff to B-Block and keep him there, where the risk of COVID-19 was objectively significant and where they knew [] COVID-19 precautions . . . were not being followed, was objectively unreasonable in light of the clearly established law at the time[.]"); *Browne v. Rodriguez*, No. 21-CV-329, 2023 WL 1069477, at *12 (D. Conn. Jan. 27, 2023) (finding the qualified immunity "question cannot be answered without resolving conflicting evidence as to whether some policies—such as mask and quarantine requirements—were actually implemented"); *see also Nazario v. Thibeault*, No. 22-1657, 2023 WL 7147386, at *2 (2d Cir. Oct. 31, 2023) (finding, albeit in a summary order, that material fact disputes precluded conclusion that a correction official "would not have understood that her conduct in the pandemic's early stages violated [plaintiff's Eighth Amendment] right[s]").

The Court likewise cannot decide Defendants' entitlement to qualified immunity as a matter of law, especially given Plaintiff's detailed allegations.  Taking his claims about the risk of COVID-19 transmission in B-Center as true, it is at least plausible that Fields' alleged lack of response was objectively unreasonable in light of clearly established law at the time regarding

---

[14] *See James*, 2021 WL 3367530, at *3; *Harper v. Cuomo*, No. 21-CV-19, 2021 WL 1821362, at *13 (N.D.N.Y. Mar. 1, 2021), *report and recommendation adopted*, 2021 WL 1540483 (N.D.N.Y. Apr. 20, 2021); *Herbert*, 2020 WL 5898977, at *9; *Morrow v. Capra*, No. 18-CV-5765, 2020 WL 3316017, at *3 (E.D.N.Y. June 17, 2020); *Dzhabrailov*, 2020 WL 2731966, at *8.

exposure to infectious diseases. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) (holding

Eighth Amendment does not permit prison officials to be "deliberately indifferent to the

exposure of inmates to a serious, communicable disease"); *see also Jolly*, 76 F.3d at 477

("[C]orrectional officials have an affirmative obligation to protect inmates from infectious

disease[.]"); *cf. Lareau v. Manson*, 651 F.2d 96, 109 (2d Cir. 1981) (stating that the "failure to

adequately screen a screen newly arrived inmates for communicable diseases" would constitute

"deliberate indifference to serious medical needs").

### III.  Conclusion

For the aforementioned reasons, Defendants' Motion is granted in part and denied in part.

Specifically, Plaintiff's Eighth Amendment claims against Annucci and Urbanski are dismissed

and Plaintiff's Eighth Amendment claim against Fields survives.

Because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is

without prejudice. *See Terry v. Inc. Vill. of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016)

(explaining that "district judges should, as a general matter, liberally permit pro se litigants to

amend their pleadings" unless "amendment would be futile").  Should Plaintiff choose to file an

amended complaint, he must do so within 30 days of this Opinion, addressing the deficiencies

identified herein.  The amended complaint will replace, not supplement, the complaint currently

before the Court.  It therefore must contain all of the claims and factual allegations Plaintiff

wishes the Court to consider, including the identification of individuals and the nature of their

involvement.  If Plaintiff fails to abide by the 30-day deadline, the claims that have been

dismissed could be dismissed with prejudice.

Additionally, Plaintiff must request an extension of time to serve Defendant Akinyombo

within 30 days of this Opinion.  Failure to meet this deadline may result in dismissal of

Plaintiff's claims against Akinyombo with prejudice.

The Clerk of Court is respectfully directed to mail a copy of this Opinion to Plaintiff and to terminate the pending motion, (Dkt. No. 20).

SO ORDERED.

Dated:    September 20, 2024
         White Plains, New York

_____
          KENNETH M. KARAS
       United States District Judge